UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

VICKIE L. BIRDWELL,           )
                              )
          Plaintiff           )
                              )      Case 2:06-0063
v.                            )      Judge Nixon/Brown
                              )
JO ANNE BARNHART,             )
Commissioner of Social Security, )
                              )
          Defendant           )

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security which found that Plaintiff was not
disabled and which denied Plaintiff Disability Insurance Benefits
("DIB"), as provided under Title II of the Social Security Act
("the Act").  The case is currently pending on Plaintiff's Motion
for Judgment on the Administrative Record.  Docket Entry No. 14.
Defendant has filed a Response, arguing that the decision of the
Commissioner was supported by substantial evidence and should be
affirmed.  Docket Entry No. 16.

For the reasons stated below, the undersigned recommends
that Plaintiff's Motion for Judgment on the Administrative Record
be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

1

# I. INTRODUCTION

Plaintiff filed her application for Disability Insurance Benefits on July 23, 2003, alleging that she had been disabled since June 21, 2002, due to back impairments, COPD, depression, and anxiety[1] *See, e.g.,* Docket Entry No. 15, Attachment ("TR"), pp. 55-60, 62. Plaintiff's application was denied both initially (TR 36-37, 40-42) and upon reconsideration (TR 38-39, 44-45). Plaintiff subsequently requested (TR 34) and received (TR 30-33) a hearing. Plaintiff's hearing was conducted on November 19, 2004, by Administrative Law Judge ("ALJ") ROBERT ERWIN. TR 458. Plaintiff and Vocational Expert, DR. J. D. FLYNN, appeared and testified. TR 458-459. Ms. Donna Zell Deck, a friend of Mrs. Birdwell, also appeared and testified. TR 458-459.

On December 13, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 14-25. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

---

[1]In Plaintiff's Disability Report, Plaintiff listed her illnesses as "back, cancer, osteotitis, COPD, nerves," and degenerative disc disease.

2

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's degenerative disc disease in lower back with laminectomy in 2001; radiculopathy to left hip and leg; chronic obstructive pulmonary disease (COPD) with continued tobacco use; and depression are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: perform sedentary work; stand or walk 4 hours in an 8-hour workday and only 30 minutes at a time; sit more than 6 hours in an 8-hour workday and only one hour at a time. She is precluded from more than occasional climbing, stooping, bending, crouching, crawling, kneeling, and balancing. She must avoid dusts, fumes, smoke, chemicals, or noxious gases. The claimant can understand, remember and persist for simple and low level detailed tasks. She will have some but not substantial difficulty interacting appropriately with coworkers and supervisors. The claimant is unable to appropriately interact with the general public. She can adjust to infrequent changes and set limited goals.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual" (20 CFR § 404.1563).

3

9. The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10. The claimant has no transferable skills any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568)/

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 § 404.1567).

12. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as hand packer and packager, production worker, and inspector, tester, and sorter. There are 2594 such jobs in the region and 83,451 in the national economy.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

TR 23-25.

On January 10, 2005, Plaintiff timely filed a request for review of the hearing decision. TR 13. On May 23, 2006, the Appeals Council issued a letter declining to review the case (TR 6-11), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence,

4

based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to back impairments, COPD, depression, and anxiety. Docket Entry No. 15.

On December 27, 2000, Plaintiff underwent a surgical procedure at Cookeville Regional Medical Center to remove a carcinoma of the vulva. TR 187. Dr. Lauretta Connelly performed the procedure and noted that both the preoperative and postoperative diagnoses were carcinoma in situ of the vulva. *Id.*

On January 30, 2001, Plaintiff returned to see Dr. Connelly for a physical examination following her wide local excision of carcinoma in situ of the vulva. TR 179. Plaintiff reported feeling well and Dr. Connelly noted that the vulva was well healed. *Id.* Dr. Connelly reported that Plaintiff should return in three months for a reassessment. *Id.*

On August 30, 2001, Plaintiff visited White County Community Hospital and saw Dr. John R. Thompson, complaining of back pain. TR 206. Radiologist Dr. Gary Militana performed a "lumbar spine complete" on Plaintiff, which revealed mild degenerative disc changes which predominate in the mid and lower lumbar segments, more marked at L5-S1. TR 208. The procedure

5

also revealed mild/moderate degenerative facet changes at L4-5 and L5-S1, with no evidence of spondylolysis or spondylolisthesis. *Id.*

On September 4, 2001, Plaintiff's lumbar spine MRI once again revealed no evidence of spondylolysis or spondylolisthesis. TR 207. The MRI also revealed degenerative disc and facet changes which predominated in the mid and lower lumbar segments. *Id.*

Throughout September, 2001, Plaintiff continued to see Dr. Thompson, receiving three epidurals over this time period, showing continued improvement. TR 204-205.

On October 12, 2001, Plaintiff met with Dr. Connelly and complained of severe panic attacks. TR 180. Dr. Connelly reported that Plaintiff had nausea and diaphoresis, but there had been no signs of recurrence of her carcinoma. *Id.* Dr. Connelly prescribed Xanax and noted that Plaintiff was to return to in December for a PAP smear. *Id.*

On October 15, 2001, Plaintiff saw Dr. Thompson, complaining of back stiffness in the morning. TR 204. Dr. Thompson stated that Plaintiff could return to work, but she should not bend or lift in excess of 20 pounds. *Id.* Dr. Thompson also noted that Plaintiff should be allowed to sit for five minutes out of every hour. *Id.* On October 24, 2001, Plaintiff saw Dr. Thompson, complaining of increased back pain. TR 203. Dr.

Thompson noted that Plaintiff returned to work but was unable to work 40 hours per week.[2]  *Id.*

On November 19, 2001, Plaintiff saw Dr. Cushman for her back injury complaining of both back and leg pain.  TR 336-338. Dr. Cushman's physical examination revealed a tender back with decreased flexion and pain on extension and on straight leg raising.  TR 337.  Dr. Cushman also reported that Plaintiff experienced numbness of the lateral foot, and that she walked with a limp.  *Id.*  Dr. Cushman noted that Plaintiff's MRI scan revealed a herniated disc and recommended a lumbar myelogram, CT scan, an EMG, and nerve conduction velocities of the right lower extremity. *Id.*  Dr. Cushman opined that Plaintiff had been working and may continue to do so. *Id.*

On December 3, 2001, Radiologist Dr. Leland Y. Tsao performed a CT spine lumbar post-myelogram on Plaintiff.  TR 344-345.  The procedure revealed a posterior central protrusion which caused mild central stenosis as well as mild narrowing of both lateral recesses, a diffused posterior and right paracentral bulge which indented the epidural fat and contacted the traversing S1 nerve root sleeves, and a transitional vertebra, partly fused with the sacrum on the left.  TR 344.

On December 10, 2001, Plaintiff returned to see Dr. Cushman for a follow up of her myelogram and EMG.  TR 334.

_____

[2]Much of the records from Dr. Thompson are illegible.

7

Plaintiff reported that she continued to have bad leg pain so severe that she had to sleep on her couch. *Id*. Dr. Cushman recommended a lumbar microdiskectomy and noted that a diskogram might be helpful in further defining the affected level. *Id*.

On December 18, 2001, Plaintiff was admitted to Skyline Medical Center for a lumbar laminectomy and diskectomy on the L5-S1 vertebrae which were performed by Dr. Arthur R. Cushman. TR 144. Both Plaintiff's preoperative and postoperative diagnoses were a herniated disc L5-S1 right. *Id*. Plaintiff was discharged the following day with prescriptions for Lortab, Phenergan, and a multivitamin. TR 143. Dr. Cushman noted that postoperatively, Plaintiff stated a significant decrease in her radicular pain. TR 142. Dr. Cushman also noted that Plaintiff's vital signs and neurological status have remained essentially within normal limits and her incision showed good signs of healing. *Id.*

On December 31, 2001, Plaintiff returned to see Dr. Cushman for a routine postoperative examination following her lumbar laminectomy. TR 333. Plaintiff reported that her pain had been significantly relieved and she was experiencing no numbness or weakness in her legs. *Id.* Dr. Cushman instructed Plaintiff in a home exercise program and noted that she would return to work in two weeks. *Id.*

On January 14, 2002, Plaintiff saw Dr. Cushman for another follow-up examination concerning her laminectomy. TR 332.

8

Plaintiff reported that she was doing well but still complained of some continuing back pain on the right side. *Id*. Dr. Cushman also noted that Plaintiff's leg pain had cleared and that she was ambulating without difficulty. *Id.* Dr. Cushman then recommended a short course of physical therapy with progression into a work-conditioning program and noted that Plaintiff should return to his office in one month. *Id.*

On January 15, 2002, Plaintiff visited the Cookeville Therapy Center and met with physical therapist Fred Bowen. TR 168-174. Plaintiff complained of right lumbosacral spine pain with referred symptoms into the right lateral thigh region, rating her current pain at a 4, which is somewhat strong pain, and her worse pain over that past thirty days as a 10, which is designated as very, very strong. TR 170. Bowen reported Plaintiff's preliminary mechanical assessment to be possible dysfunction related to adaptively shortened tissues. TR 172. Bowen started Plaintiff on a treatment of moist heat of the lumbar spine, followed by manual electrical stimulation to the paraspinous region of the lumbar spine. *Id.* Bowen also started Plaintiff on lumbar stabilization exercises and instructed Plaintiff in a home exercise program. *Id.*

On February 4, 2002, Plaintiff returned to see Dr. Cushman after her physical therapy program, which she stated didn't help at all. TR 331. Plaintiff reported continuing pain in her back and legs and that the physical therapy was intolerable because

9

of this pain. *Id*. Dr. Cushman also noted that although Plaintiff told the rehabilitation nurse that her back was swollen and bruised, Plaintiff's examination showed that it was not. *Id*. Dr. Cushman further noted that Plaintiff was walking briskly with no limp, but during her examination, she exhibited a markedly exaggerated limp. *Id*. Dr. Cushman ordered an MRI scan and prescribed Medrol Dosepak. *Id.*

On February 13, 2002, physical therapist Bowen noted that Plaintiff had visited Cookeville Therapy Center on that day and the previous day for a Functional Capacity Evaluation. TR 153-163. Bowen reported that Plaintiff suffered from a limitation of unassisted lumbar spine range of motion which affected her material and nonmaterial handling abilities. TR 153. Bowen also opined that Plaintiff was able to perform at the light level of physical demand characteristics of work, which entails the occasional lifting of 20 pounds and frequent lifting of 10 pounds. *Id*.

On February 15, 2002, Plaintiff underwent a lumbar spine MRI without and with contrast performed by radiologist Dr. Michael Levitt. TR 164-165. The MRI impression revealed L5-S1 degenerative disc disease, sacralization of L5 vertebra, posterior disc protrusion at L4-5 vertebra resulting in mild central spine canal stenosis, and status post right laminectomy at L5-S2 without evidence of recurrent disc herniation. TR 164.

10

On February 18, 2002, Plaintiff returned to Dr. Cushman for a follow up regarding her lumbar laminectomy. TR 330. Dr. Cushman noted good progress in Plaintiff's recovery and that Plaintiff was capable of functioning at the light level of physical demand. *Id*. Dr. Cushman also noted that Plaintiff could return to work with a permanent lifting restriction of 25 pounds and a restriction on repetitive bending, lifting, and stooping. He recorded the Patient was on medications of Xanax, Pamelor and Soma. TR 339. *Id*.

On February 20, 2002, Plaintiff visited Cookeville Regional Medical Center for an annual exam.[3] TR 176-178. Plaintiff complained that she could not sleep, was anxious at times, and felt depressed. TR 176. Plaintiff's current medications were listed as Depro Provera and Lortab. *Id*.

On April 29, 2002, Plaintiff returned to see Dr. Cushman, complaining of increased pain in her lower back over the past month. TR 339. Dr. Cushman noted that Plaintiff's exam revealed mild tenderness in her back and the ability to ambulate without a limp or asymmetry. *Id*. Dr. Cushman recommended that Plaintiff have an MRI scan of the lumbar spine. *Id.*

On May 2, 2002, Dr. Tsao performed an MRI spine lumbar without and with contrast. TR 342-343. The MRI revealed that

_____

[3]The note of the physician who conducted the exam is illegible, as is the majority of this record.

11

Plaintiff's right S1 nerve was displaced posteriorly in the right lateral recess, and a posterior central protrusion produced mild central stenosis and mild narrowing of both neural foramina. TR 343.

On December 10, 2002, Plaintiff saw Dr. Thompson, complaining of foot pain mainly in the right heel.[4] TR 201. An x-ray of Plaintiff's right foot revealed a healed fracture through the distal one-third of the right third MT with interval remodeling and a bunion deformity of the first MTPJ, with periarticular cystic changes which may represent underlying gout and/or degenerative change. TR 202. The x-ray also revealed a tiny traction spur on the ventral "os calsis" near the plantar fascia insertion. *Id*.

On December 30, 2002, Plaintiff saw Dr. Thompson, complaining of pain in the back lateral thigh, left calf, and foot. TR 199. Dr. Thompson ordered an MRI lumbar spine, which was performed by Dr. Rajesh Bhojwani of WCCH, and revealed degenerative disc disease at the L5-S1 level with a diffuse broad-based circumferential disc bulge, which brushed up against the exiting L5 nerve root in the lateral recesses. TR 199-200. The MRI impression revealed that this condition was slightly worse on the left than the right. TR 200.

---

[4]Much of this record from Dr. Thompson is illegible.

On January 6, 2003, Plaintiff saw Dr. Thompson for a follow up after her MRI. TR 198. Dr. Thompson noted that he would review the results and consider an epidural. *Id.*

On February 3, 2003, Plaintiff saw Dr. Cushman, complaining of a new onset of back and left leg pain and numbness. TR 327. Plaintiff's exam revealed a tender and stiff back and decreased motion due to pain. *Id.* Dr. Cushman's diagnosis was recurrent back pain with radiculopathy, and he recommended a lumbar spine series with flexion-extension views and an MRI of the lumbar spine. *Id.* Dr. Cushman prescribed Bextra and asked to see Plaintiff again when her studies were completed. *Id*.

On February 12, 2003, Dr. Daniel Coonce performed Plaintiff's MRI, which revealed no evidence of a recurrent disc, but did indicate mild degenerative disc disease at L4-5 verterbrae or L5-S1. TR 326.

On April 25, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Hosakote Nagaraj, complaining of joint and muscle pain, bumps on the head, and right ear pain. TR 318-321. Dr. Nagaraj performed a physical examination on Plaintiff, which revealed normal results for the head, localized tenderness and otitis media in the ear, and a full range of motion in all joints but decreased range of motion in the spine accompanied by tenderness. TR 319-320. Dr. Nagaraj ordered a bone densitometry, pulmonary function test, and respiratory flow volume loop. TR 321.

13

The bone densitometry revealed an impression of osteoporosis, and Dr. Nagaraj prescribed Lortab, Soma, and Xanax. TR 321-322. Plaintiff's blood work of April 28, 2003, revealed normal cholesterol levels but abnormally low levels of RBC and abnormally high levels of "MCV", "MCH" and "C-Reactive Protein." TR 314-317.

On May 2, 2003, Plaintiff came to Cookeville Medical Center for her annual physical and PAP examination/test, complaining of no problems at that time. TR 311-313. Dr. Mary E. Baldwin's plan included a gynecological examination and a mammogram, and her assessment of a malignant neoplasm of vulva. TR 312-313.

On May 9, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Baldwin, complaining of a skin lesion on the rectum. TR 308. Dr. Baldwin assessed Plaintiff with malignant neoplasm of the vulva, and the skin lesion was excised using sterile technique. TR 309-310. After the excision, Dr. Baldwin reported that the lesion revealed no atypia or malignancy. TR 310. Plaintiff was instructed to follow-up in one week. TR 309.

On May 19, 2003, Plaintiff came to Cookeville Medical Center for suture removal. TR 305-307. Dr. William P. Titus removed two sutures from the left peri anal area and applied neosporin. TR 306. Following a physical exam, Dr. Titus assessed Plaintiff with osteoporosis and anxiety, prescribing Xanax and

14

continuing Plaintiff's Depo-Provera. TR 306-307. Dr. Titus noted that Plaintiff was to follow up with Dr. Nagaraj. TR 307.

On May 27, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a refill on medications and a follow up on her lab results. TR 301-304. Plaintiff also complained of intermittent pain in the right ear. TR 301-303. Dr. Nagaraj's physical examination revealed localized tenderness in the mastoid and otitis media in the tympanic membrane[5]. TR 302. Plaintiff's lab results were negative for intraepithelial lesion or malignancy, but showed reactive cellular changes associated with inflammation. TR 304.

On May 28, 2003, Plaintiff visited Livingston Regional Hospital and saw Dr. Nagaraj for a pulmonary function analysis. TR 189-193. The computerized interpretation showed a mild obstructive lung defect and a decrease in flow rate at peak flow at 25%, 50%, and 75% of the flow volume curve. TR 190. The interpretation also showed Plaintiff's diffusion capacity was within normal limits. *Id*.

On June 26, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up for sinusitis, anxiety, and panic disorder, also complaining of allergies. TR 298-301.

---

[5]The report of May 27, 2003 showed no prescriptions, assessments, or follow-up plans given by Dr. Nagaraj for Plaintiff's ear complaints.

Dr. Nagaraj prescribed Advair Diskus, Soma, Lortab, and Fosamax, and noted that Plaintiff should follow up in one month.  TR 300.

On July 24, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up on her back disorder, arthritis, and panic disorder.  TR 295-297.  Plaintiff denied any other problems.  TR 295.  Dr. Nagaraj continued Plaintiff's prescriptions for Soma, Lortab, Fosamax, Advair Diskus, and Xanax. TR 297.

On July 31, 2003, Plaintiff saw Dr. Thompson, complaining of groin pain radiating down the right leg.  TR 196-197.  Dr. Thompson assessed Plaintiff with HNP and radioculpathy, and prescribed Medrol Dosepak and epidurals.[6]

On August 21, 2003, Plaintiff visited Cookeville Medical Center, complaining of a red spot on her head that itched, but denied any other problems.  TR 294.[7]

On September 19, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj, complaining of bilateral ear pain and a sore throat.  TR 291-292.  Dr. Nagaraj's assessment included lumbago, COPD, osteoporosis.  TR 292.  Dr. Nagaraj prescribed Soma, Lortab, Fosamax, Xanax, and Hydrocortisone.  TR 292.

---

[6]Another prescription is listed in this record, but it is illegible, as is much of the record.

[7]The information above is the only information contained in this record of August 21, 2003.

16

On October 1, 2003, Plaintiff underwent a physical examination by Dianne Dotson, after which Dr. Joseph Johnson reported a regular heart rate and rhythm, mildly to moderately decreased breath sounds, a moderately slow gait due to lower back pain, and no shortness of breath. TR 209-212. Dr. Johnson assessed Plaintiff with low back pain, status post lumbar spine surgery, COPD which symptomatically seems mild, panic attacks, and depression. TR 212. Dr. Johnson opined that Plaintiff should be able to sit for more than six hours during an eight-hour day, stand or walk for four hours during an eight-hour day, routinely lift 15 pounds, and occasionally lift 25 pounds. *Id.*

On October 13, 2003, Plaintiff underwent a chest x-ray at Cookeville Medical Center, which revealed old granulomatous disease and early chronic obstructive pulmonary disease. TR 218. Dr. P. K. Jain recommended a pulmonary function test, which revealed that Plaintiff could understand directions and expended maximal effort, yet she was unable to blow six seconds. TR 213-318.

On October 21, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj, complaining of nervousness. TR 284-285. Dr. Nagaraj's assessment included arthritis, lumbago, and osteoporosis, and he prescribed Soma, Lortab, Fosamax, Xanax, Advair Diskus, and Allegra-D. TR 284.

On October 22, 2003, Plaintiff underwent a mental status examination by Dianne Dotson, on which licensed psychologist Linda

17

Blazina, PhD reported. TR 219-224. Dr. Blazina diagnosed Plaintiff with major depressive disorder, recurrent, and moderate, with psychotic features and anxiety disorder NOS. TR 223. Dr. Blazina also noted that Plaintiff's ability to understand and remember did not appear significantly limited at the present time. *Id*. Dr. Blazina also reported that Plaintiff's ability to sustain concentration and persistence did not appear significantly limited and her social interaction abilities were felt to be mildly limited due to Plaintiff's perception that people do not like her, which may impact her ability to interact with others in a job setting. *Id*. Finally, Dr. Blazina noted that Plaintiff's adaptation abilities did not appear to be significantly limited at this time. TR 224.

On November 17, 2003, Dr. Carole Kendall completed a Psychiatric Review Technique Form on Plaintiff and assessed her with depressive syndrome with anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with changes in weight, sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, and hallucinations, delusions, or paranoid thinking. TR 228. Dr. Kendall also assessed Plaintiff with anxiety disorder NOS . TR 230. Dr. Kendall opined that Plaintiff experienced mild limitations in activities of daily living and moderate limitations in both

18

maintaining social functioning and concentration, persistence, or pace.  TR 235.

Also on November 17, 2003, Dr. Kendall completed a Mental Residual Functional Capacity Assessment (RFC) on Plaintiff and opined that Plaintiff can understand, remember, and persist for simple and low level detailed tasks.  TR 239-241.  Dr. Kendall further opined that Plaintiff will have some, but not substantial difficulty interacting appropriately with the general public, coworkers, and supervisors.  TR 241.  Dr. Kendall also opined that Plaintiff can adjust to infrequent change and set limited goals. *Id.*

On November 20, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up for her arthralgia and anxiety.  TR 281-283.  Dr. Nagaraj assessed Plaintiff with lumbago, arthritis, and osteoporosis, and prescribed Soma, Lortab, and Xanax.  TR 281.

On December 5, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj, complaining of chills and fever, sore throat, left ear pain, vomiting, and diarrhea. TR 278-280.  Dr. Nagaraj assessed Plaintiff with acute sinusitis, acute pharyngitis, otitis medica, and acute nasopharyngtis.  TR 278.  Dr. Nagaraj then prescribed Nasacort AQ, Biaxin, Bidex-DM, and a multi-vitamin.  TR 277.

19

On December 19, 2003, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up visit for her arthritis, arthralgia, and anxiety. TR 274-276. Dr. Nagaraj assessed Plaintiff with arthritis, lumbago, and COPD, and prescribed Soma, Lortab, and Xanax. TR 274.

On December 30, 2003, Dr. Robert E. Burr completed a Physical RFC Assessment (TR 241-249) on Plaintiff and opined that Plaintiff can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and was unlimited in her ability to push and/or pull. TR 243. Dr. Burr also opined that Plaintiff was frequently limited in her ability to climb, balance, stoop, and crouch, with occasional limitations in kneeling and crawling. TR 244. Dr. Burr further opined that Plaintiff experienced no manipulative, visual, communicative limitations, but stated that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation because of her COPD (chronic obstructive pulmonary disease). TR 245-246.

On January 20, 2004, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up visit for arthritis and back disorder. TR 271-273. Dr. Nagaraj assessed Plaintiff with lumbago, arthritis, acute nasopharyngitis, and acute sinusitis, and

20

prescribed Soma, Lortab, Xanax, Nasacort AQ, Allegra-D, and Advair Diskus.  TR 271.

On February 19, 2004, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj for a follow up visit for arthralgia, arthritis, and leg cramps. TR 267-270.  Dr. Nagaraj assessed Plaintiff with allergic rhinitis, osteoarthritis, anxiety, ankylosing spondylitis, back disorder, lumbago, arthritis, and osteoporosis. TR 267-268.  Dr. Nagaraj prescribed Soma, Lortab, Xanax, Advair Diskus, Fosamax, and a multi-vitamin, and ordered x-rays of the total spine, hips, and knees. TR 268.  The total spine x-ray revealed mild osteophytes formations in the L4-5 vetebrae region.  TR 420.

On February 20, 2004, Treating Professional Sherrie Foster, Ed.D. assessed Plaintiff's condition.  TR 252-263.  Foster noted that during Plaintiff's mental exam, Plaintiff's thought content was normal, her thought flow was organized, her mood was depressed and anxious, her memory and concentration were poor, and her insight and judgment were fair.  TR 260.  Foster also noted Plaintiff possessed suicidal ideations.  TR 261.  Foster diagnosed Plaintiff with major depressive disorder, in full remission, and generalized anxiety disorder.  TR 262.  In her Clinically Related Group (CRG) form, Foster reported mild limitations in Plaintiff's activities of daily living and adaptation to change and moderate limitations in interpersonal functioning and maintaining

21

concentration, task performance, and pace. TR 252-253. Foster noted that Plaintiff fell into Group 3, which is for persons who are formerly severely impaired and listed Plaintiff's current GAF as 45. TR 254. Foster referred Plaintiff for counseling and a psychiatric evaluation at that time. TR 263.

On February 27, 2004, Plaintiff met with Foster for her first therapy session after her intake at the Vol. Behavioral Health Care System facility. . TR 250. Plaintiff reported not sleeping well, anxiety attacks, grief issues, feelings of worthlessness, hopelessness, and loss of faith since she was no longer attending church. *Id.* Foster recommended that Plaintiff consider re-entering her church and noted that Plaintiff's mood and affect seemed to improve throughout the session. *Id.*

On March 4, 2004, Plaintiff called in to Cookeville Medical Center complaining that she was unable to sleep. TR 266. Bonnie Scott assessed Plaintiff with depression and insomnia, and prescribed Remeron at Dr. Nagaraj's request. *Id.*

On March 9, 2004, Plaintiff returned for a follow up with Dr. Cushman, complaining that her back and leg still hurt and she was unable to work. TR 325. Plaintiff's exam revealed a mild limp and a tender back. *Id.* Dr. Cushman opined that Plaintiff was certainly unemployable in the type of work she had been doing, but did not recommend any medication change, therapy, or imaging

22

studies. *Id.* Dr. Cushman noted that he would see Plaintiff again as needed. *Id.*

On March 12, 2004, Plaintiff again met with Treating Professional Foster, who noted that Plaintiff's mood and affect were improved and Plaintiff's activities had made progress daily. TR 397. Foster also noted, however, that Plaintiff was still grieving but experiencing no suicidal or homicidal ideations. *Id*.

On March 26, 2004, Plaintiff met with Foster and reported to be doing much better, sleeping well, gardening, and getting out more. TR 396. Foster noted that this session focused on childhood sexual, emotional, and physical abuse, information which Plaintiff had kept secret for many years. *Id.*

On March 29, 2004, Dr. Louise G. Patikas completed a Physical RFC Assessment on Plaintiff, reporting that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and was unlimited in her ability to push and/or pull. TR 349-354. Dr. Patikas also opined that Plaintiff was frequently limited in all postural limitations, but that Plaintiff experience no limitations in her manipulative, visual, or communicative limitations. TR 351-352. Dr. Patikas did, however, note that Plaintiff should avoid exposure to fumes, odors, dusts, gases, and poor ventilation due to her COPD. TR 353.

23

On April 15, 2004, Dr. William Regan completed a Psychiatric Review Technique Form and Mental RFC Assessment regarding Plaintiff's condition. TR 355-368, 369-372. In the first form, Dr. Regan noted that Plaintiff suffered from depressive syndrome with and anxiety disorder NOS. TR 355-368. Dr. Regan further noted that Plaintiff experienced mild limitations in activities of daily living and moderate limitations in maintaining social functioning and concentration, persistence, or pace. TR 365. In the Mental RFC, Dr. Regan noted marked limitations in Plaintiff's ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to interact appropriately with the general public. TR 369-370. Dr. Regan noted moderate limitations in Plaintiff's abilities to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to respond appropriately to changes in the work setting. *Id.*

On April 20, 2004, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj, complaining of a persistent cough and severe arthritis pain. TR 406-407. Dr. Nagaraj prescribed Lortab, Xanax, Biaxin, Allegra-D, Zanaflex, Remeron, Soma, Advair Diskus, Nasacort-AQ, and a multi-vitamin. TR 407.

On April 21, 2004, Plaintiff called into Cookeville Medical Center complaining of nausea and vomiting. TR 405.

24

Plaintiff requested Phenergan to relieve her symptoms, and Dr. Nagaraj wrote the prescription. *Id.*

On April 28, 2004, Dr. Cushman sent a letter to Attorney Donna Simpson, stating that he could not find anything that he believed could be further treated from a neurological standpoint, admitting he could not verify Plaintiff's complaints of osteoarthritis, rheumatoid arthritis, and osteoporosis. TR 390. Dr. Cushman opined that Plaintiff could do sedentary work with a 10-pound weight limit as a result of back problems for which he had treated her. *Id.*

On May 3, 2004, Plaintiff met with Treating Professional Foster, and Foster reported that Plaintiff was tearful and upset due to her disability denial. TR 395. Despite an outburst while at Foster's office, Foster reported that Plaintiff was not considered a risk at that time. *Id.*

On May 17, 2004, Plaintiff again met with Foster, and Foster reported Plaintiff's mood and affect to be brighter. TR 394. Foster also noted that Plaintiff did not cry at this session and seemed much improved. *Id.*

On June 2, 2004, Plaintiff met with Foster, and Foster reported that Plaintiff was open and talkative, but trembling. TR 394. Foster also noted that Plaintiff remained positive but appeared to be poorly handling her grief. *Id.*

Case 2:06-cv-00063   Document 18   Filed 03/11/08   Page 25 of 51 PageID #: 87

Also on June 2, 2004, Plaintiff met with Dr. Rosalia Dominguez for a mental status exam. TR 393. Dr. Dominguez reported that Plaintiff was anxious, upset, and sobbing throughout the course of the interview. *Id*. Plaintiff reported hearing voices since her sister passed away. *Id*. Dr. Dominguez prescribed Lexapro, Wellbutrin, and Primadone, and noted Plaintiff's additional prescriptions of Xanax and Seroquel. *Id.*

On June 3, 2004, Plaintiff arrived at Cookeville Medical Center for a PAP smear, but also complained of two spots on her vaginal area. TR 400-401. Plaintiff saw Nurse Practitioner Zelda K. Carter, who ordered a gynelogical examination, the results of which were negative. TR 401, 416-417. Nurse Practitioner Carter prescribed Flagyl and Vagifem, and noted that Plaintiff should follow-up as needed. TR 401.

On June 16, 2004, Plaintiff met with Foster, who noted that Plaintiff's mood and affect were appropriate. TR 391. Plaintiff reported that her family and friends continued to support her and help her feel better. *Id.*[8]

On July 16, 2004, Plaintiff met with Dr. Naragaj for a follow up and denied any new problems. TR 446-447. Dr. Naragaj

---

[8]From June 30, 2004 to October 21, 2004, Plaintiff continued to meet with Foster and Dr. Dominguez, each visit resulting in diagnoses of major depressive disorder, recurrent, severe without psychotic features, and generalized anxiety disorder. TR 421-431. Plaintiff's medications throughout this time period did not change, and included Lexapro, Wellbutrin, Primidone, and Vistaril. *Id.*

26

assessed Plaintiff with pharyngitis, allergic rhinitis, depression, osteoporosis, oeteoarthritis, and back disorder, and prescribed Biaxin, Allegra-D, Nasacort AQ, Lortab, Soma, Xanax, Advair Diskus, Zanaflex, and a multi-vitamin.  TR 447.

On August 16, 2004, Plaintiff again met with Dr. Naragaj for a follow up and denied any new problems.  TR 444-445.  Dr. Naragaj assessed Plaintiff with osteoporosis, depression, lumbago, and bronchitis with airway obstruction, and prescribed Xanax, Zanaflex, Soma, Lortab, Nasacort AQ, and Advair Diskus.  TR 445.

On September 10, 2004, Plaintiff visited Cookeville Medical Center and saw Dr. Nagaraj, complaining of persistent lumps on her head, arthritis, lumbago, and anxiety.  TR 441-442.  Dr. Nagaraj prescribed Soma, Lortab, Xanax, and Robaxin.  TR 442.

On October 14, 2004, Plaintiff saw Dr. Naragaj, complaining of a lump behind her left ear, but denied any other problems.  TR 439-440.  Dr. Naragaj prescribed Soma, Lortab, and Robaxin for her Lumbago and Xanax for Plaintiff's anxiety.  TR 440.

On November 8, 2004, Plaintiff visited Cookeville Medical Center and saw Dr. Pushpendra K. Jain, complaining of back pain characterized by spasms, numbness, stabbing, and piercing pains.  TR 448-449.  Dr. Jain ordered the following procedures:  pulse oximetry;  spirometry; airway inhalation treatment; aerosol/vapor inhalations;  thoracic, electrical bioimpedance;  chest x-ray; ectrocardiogram; and a CAT scan of the chest.  TR 449.  Plaintiff's

27

spirometry report revealed moderate airway obstruction and that Plaintiff's post bronchodilator test was not improved. TR 437.

On November 9, 2004, Dr. Jain assessed Plaintiff's physical ability to do work-related activities (TR 434-436), and opined that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than ten pounds, stand and/or walk less than two hours in an eight-hour workday, and sit less than about six hours in an eight-hour workday. TR 434-435. Dr. Jain also noted that Plaintiff was limited in both upper and lower extremities in her ability to push and/or pull and that Plaintiff would need to periodically alternate sitting and standing to relieve pain or discomfort. TR 435. Dr. Jain opined that Plaintiff experienced occasional limitations in her ability to climb, balance, kneel, reach, handle, finger, and feel. TR 436. Dr. Jain further opined that Plaintiff's sight was limited and that Plaintiff should avoid even moderate exposure to extreme cold and heat, vibration, fumes, odors, dusts, and gases, and perfumes. *Id*. Dr. Jain noted that Plaintiff should avoid concentrated exposure to dust, vibration, hazards, humidity/wetness, solvents/cleaners, and chemicals. *Id*.

### B. Plaintiff's Testimony

Plaintiff was born on September 14, 1957, and has an eleventh grade education. TR 463-464. Plaintiff testified that she subsequently received her GED and has never had any specialized

28

vocational training.  TR 465.  Plaintiff testified that she has been married since 1998, and has no children.  TR 463, 474.

Plaintiff reported that the she was last employed on June 15, 2002 as a deli manager at a grocery store.  TR 465.  Plaintiff testified that this job ended after four years because she couldn't do the job anymore because of restrictions of light limits in bending and lifting.  *Id.*  Plaintiff further stated that these problems were caused by an injury on the job and her subsequent back surgery.  TR 466.

Plaintiff testified that her back problems began in 1990, with a muscle pull.  TR 466.  Plaintiff further testified that her lower back problems did not begin until 2001, when she was injured on the job and had to undergo surgery.  *Id.*  Plaintiff stated that following her surgery, she participated in physical therapy for about four weeks but that it did not help in her pain.  *Id.*  Plaintiff testified that since that time she has not undergone any other physical therapy regimen.  *Id.*

Plaintiff testified that her doctors now give her prescriptions to help with her back pain, specifically muscle relaxers.  TR 467.  Plaintiff also testified that she was doing rehabilitation exercises three times a week to help with the pain, but that they began making her arthritis worse.  *Id*.  Plaintiff further testified that it had been six months since she quit doing the exercises.  *Id.*

29

Plaintiff described her back pain as an electric shock running down her legs. TR 476. Plaintiff stated that this pain radiates down both legs, down her spine to the calf. TR 476-477. Plaintiff also reported having muscle spasms in both calves about every day. TR 477. Plaintiff rated her pain at a seven at the time of testimony, but at a 10 before she took her medications in the morning. TR 477-478. Plaintiff testified that after she takes these medications, her pain decreases to a five. TR 478.

Plaintiff reported that to help control the pain, she bathes in a Jacuzzi and uses a heating pad, but she also stated that sometimes she is forced to "curl up in a ball and have a pillow against her back" which eases her pain. TR 478-479.

Plaintiff also stated that she has some problems with breathing and has been smoking for 36 years. TR 469. Plaintiff testified that breathing became a problem for her when she was exposed to chemicals at Big Star grocery store. *Id.* Plaintiff further testified that she smokes about 10 cigarettes a day but is trying to quit. *Id.*

Plaintiff reported that she has problems with shortness of breath when she walks long distances, such as going to her mailbox and back. TR 469. Plaintiff also reported that she uses an inhaler whenever she gets short of breath, and has to use it usually more than the instructed two times a day. TR 470.

Plaintiff testified that on a typical night, she might sleep three hours, then have to get out of bed because of pain. TR 470. Plaintiff stated that pain wakes her up and she will then have to get up to get cramps out of her feet and legs. *Id.*

Plaintiff testified that she enjoys gardening and raising flowers, but that she can no longer do these activities. TR 470. Plaintiff further testified that the last time she did any gardening was in 2001. *Id.* Plaintiff stated that her husband now does the gardening at her supervision and he also goes grocery shopping with her. TR 471. Plaintiff reported that when her and husband grocery shop together, she makes out the list, and he goes with her and puts the items in the cart, while she usually has to lean on the cart while in the store. *Id.*

Plaintiff testified that either her husband or a friend comes over to do all of the housework. TR 471. Plaintiff did testify, however, that she does some laundry and prepares both breakfast and lunch for herself. *Id.*

Plaintiff reported that her friend Donna Zell visits her at least once a week. TR 473. Plaintiff further reported that these visits usually last about three or four hours, during which the two spend time talking. *Id.*

Plaintiff reported that she is also visited by her brother and his wife once in awhile, along with her nephew. TR

31

473. These visits from her nephew usually occur about once a month. TR 474.

Plaintiff testified to be a member of Free Will Baptist Church but also stated that she had not attended in two to three months. TR 474. Plaintiff further testified that when she did go to church, she could not sit through the entire service, and she quit attending because she did not want to interrupt the service by having to leave. *Id.*

Plaintiff testified that her appetite is poor and that her only regular exercise is walking to the mailbox, which is only 20 to 25 feet from her front door. TR 474-475. Plaintiff testified that when she does walk, she uses a cane that she borrowed from a neighbor. TR 475.

Plaintiff reported that she has trouble getting dressed, especially putting her pants on, and usually only gets up and gets dressed about two days a week. TR 475, 481. Plaintiff further reported that if she does get dressed, she usually does not do so until 11:00 a.m. or even 1:00 p.m.. TR 481. Plaintiff also reported that she likes someone to be home when she takes a shower or a bath because she is fearful that she will fall. TR 479.

Plaintiff stated that she spends most of the day sitting, walking, and reading the Bible. TR 476. Plaintiff also stated that she keeps the television on, mostly just for background noise, but will watch the news. TR 481-482. Plaintiff reported that she

32

naps in the recliner about once or twice a day for about 10 to 15 minutes at a time. TR 482. Plaintiff further stated that she can normally only sit about 15 minutes before she has to stand up and move around, and then can only stand for about 15 minutes before she has to sit down again. TR 476. Plaintiff also reported that she can lift only about 10 pounds. *Id*.

Plaintiff stated that she had been experiencing emotional problems, especially after the death of her sister in September. TR 467-468. Plaintiff testified that she saw Dr. Domingus for treatment of her emotional condition, and began this treatment in February of 2004. TR 468. Plaintiff further testified that Dr. Domingus recommended that she go to a therapist, which have somewhat helped with her mental problems. *Id*.

Plaintiff stated that she is still having problems with depression following the deaths of her sister and brother-in law. TR 479-480. Plaintiff reported that she has a hard time concentrating and sometimes wishes she could join them. TR 480. Plaintiff stated that she has attempted to take her life but that she did not go to the doctor and instead tried to deal with it herself. *Id*. Plaintiff stated that she cries two or three times a day. TR 481.

Plaintiff also stated that she has difficulty being around people because they make her nervous. TR 480. Plaintiff

Case 2:06-cv-00063   Document 18   Filed 03/11/08   Page 33 of 51 PageID #: 95

further stated that she has problems with her energy level, reporting that she stays tired all the time. TR 481.

Plaintiff friend and neighbor, Ms. Donna Zell Deck, also testified at the hearing. TR 483-486. Ms. Deck stated that she has grown up in the same community with Plaintiff and known Plaintiff's family for most of her life. TR 483.

Ms. Deck reported that she sees Plaintiff at least once a week. TR 484. Ms. Deck reported that during these visits, Plaintiff mostly sits and cries a lot of the time. *Id*. Ms. Deck stated that when she visits Plaintiff, she will sometimes be in the bed or sitting on the porch in the sun. *Id*.

Ms. Deck stated that Plaintiff was really depressed and not active like she used to be. TR 484. Ms. Deck also stated that Plaintiff had always been a house cleaner, but now she is unable to do these activities. *Id*. Ms. Deck stated that Plaintiff talks about feeling hopeless and helpless, and about being able to do the things that she could do before. TR 485. Ms. Deck also reported that Plaintiff talks about feeling anxious, nervous, and scared. *Id*.

Ms. Deck stated that Plaintiff does very little activity in the community. TR 485. Ms. Deck observed Plaintiff used to be big on going places and helping a lot of people but she does none of that now. *Id.*

34

Ms. Deck also noted that on her visits, there were times when Plaintiff could not walk and limped or could not straighten up her back. TR 484. Ms Deck stated: "There's times she actually . . . holler 'oh' when she's trying to get up. She has to . . . hold onto another chair or a piece of furniture in order to get up out of a chair or off the couch or something like that." *Id.*

Ms. Deck reported that she could not remember exactly when Plaintiff's back problems began, but she estimated they began about three or four years ago, when she was injured at work. TR 485. Ms. Deck further reported that Plaintiff's emotional problems started after her back problem, when Plaintiff discovered that she was really hurt and was not going to be able to do what she had done before. TR 486.

### C. Vocational Testimony

Vocational Expert (VE), James D. FLYNN, also testified at Plaintiff's hearing. TR 486-491. With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff had been a at a deli manager/department, which is classified as medium, skilled work. TR 487. The VE stated that Plaintiff had also been a deli cutter/slicer, which is light, unskilled work. *Id.* The VE also stated that Plaintiff had been a cashier/checker, which is light, semi-skilled work. *Id.* The VE finally stated that Plaintiff had been a marker, which is light, unskilled work. *Id.*

35

The ALJ then asked the VE if any of the two jobs which required some skills have skills that would be transferable to sedentary work. TR 487. The VE answered they would not. *Id.*

The ALJ presented the VE with a hypothetical situation in which the hypothetical claimant was limited to a range of light work, could stand or walk four hours in an eight-hour day with normal breaks, could sit for more than six hours in an eight-hour day with normal breaks, could not stand for more than 30 minutes at a time or sit for more than an hour at a time without being able to move from her position, experienced some breathing problems, and was unable to work around exposure to dust, fumes, smoke, chemicals, and noxious gases. TR 487-488. The ALJ also noted that the hypothetical claimant could understand, remember, and persist in simple and low-level detailed tasks, would have some but not substantial difficulty in interacting appropriately with the general public, co-workers, and supervisors, and could adjust to infrequent change and set limited goals. *Id*. The ALJ then asked the VE, given those limitations and taking into account the claimant's age, education, and prior relevant work experience, if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.*

The VE answered that the hypothetical claimant could not, as a result of the weight and the standing limitations, this claimant would have. TR 488. The VE opined that in the State of

Tennessee, there were approximately 1,418 jobs doing data entry, 765 as an interviewer, and 1,698 as a receptionist/information clerk, all of which are entry-level, unskilled jobs that would be appropriate for the hypothetical claimant. *Id.* Nationwide, these job numbers would rise to 70,879 for data entry, 38,367 for interviewer, and 93,477 for a receptionist/information clerk. TR 488-489.

The ALJ then presented the VE with another hypothetical situation in which the claimant was limited to sedentary weight, was unable to do any more than occasional climbing, stooping, bending, crouching, crawling, kneeling, or balancing, and experienced the same standing, walking, breathing, and emotional limitations as in the previous hypothetical. TR 489. The ALJ also added that the hypothetical claimant had a Global Assessment of Functioning (GAF) score of about 55, and should not be required to work or deal with the general public. *Id*.

The VE opined that in the State of Tennessee, there were approximately 343 jobs as a hand packager, 1,875 jobs as a production worker, and 376 jobs as an inspector/tester/sorter, all of which are sedentary positions that would be appropriate for the hypothetical claimant. TR 489. Nationwide, these job numbers would rise to 12,634 for hand packager, 56,784 for production worker, and 14,042 for inspector/tester/sorter. *Id.*

37

The ALJ then presented the VE with another hypothetical situation in which the claimant had the following limitations: occasional or frequent lifting of less than 10 pounds; standing or walking less than two hours in an eight-hour workday; sitting for less than six hours in an eight-hour workday; restrictions in both upper and lower extremities; constant pain which affected her concentration, and the need for unscheduled breaks every 15 minutes, and absence from missing four or more days of work a month; no more than occasional climbing, balancing, and kneeling; no crouching or crawling; no more than occasional, reaching handling, fingering, or feeling with hands or arms; the need to wear glasses; avoidance of concentrated exposure to noise, dust, humidity, wetness, hazards, solvents, cleaners, and chemicals; and the avoidance of even moderate exposure to extreme cold and extreme heat, vibration, fumes, odors, dust, gases, and perfumes. TR 489-490.

The VE responded that the hypothetical claimant would not be able to perform work in a regular competitive environment. TR 490.

The ALJ presented the VE with a final hypothetical in which to the hypothetical claimant would be restricted to sedentary work and her Global Assessment of Functioning would be at 45, rising to 55, half of the time. TR 490-491.

38

The VE responded that he did not believe the hypothetical claimant would be capable of performing work.  TR 491.

### III.  CONCLUSIONS OF LAW

#### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

Substantial evidence means such relevant evidence as a reasonable mind would accept as adequate to support the conclusion. *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence has been further quantified as more than a mere scintilla of evidence, but less than a preponderance. *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S. Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745

39

F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Substantial gainful activity not only includes previous work performed by Plaintiff, but also, considering

40

Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a severe impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the listed impairments[9] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the

---

[9]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

41

> claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as the grid, but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the

Case 2:06-cv-00063  Document 18  Filed 03/11/08  Page 42 of 51 PageID #: 104

Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in rejecting the opinion of Plaintiff's treating physician Dr. Jain and in failing to properly evaluate Plaintiff's mental impairments. Docket Entry No. 15. Accordingly, Plaintiff maintains that the Commissioner's decision should be reversed, or in the alternative, remanded pursuant to sentence four of 42 U.S.C. § 405(g), *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176

43

(6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

## 1. The ALJ erred in rejecting the opinion of Plaintiff's treating physician, Dr. Jain.

Plaintiff argues that the ALJ improperly rejected the opinion of Dr. Jain, who assessed Plaintiff with restrictions that would prevent her from performing even sedentary work.  Docket Entry No. 15.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2)  Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not

44

give the treating source's opinion controlling
weight, we apply the factors listed in paragraphs
(d)(2)(I) and (d)(2)(ii) of this section, as well
as the factors in paragraphs (d)(3) through (d)(6)
of this section in determining the weight to give
the opinion.

. . .

(3) Supportability.  The more a medical source
presents relevant evidence to support an opinion,
particularly medical signs and laboratory findings,
the more weight we will give that opinion.  The
better an explanation a source provides for an
opinion, the more weight we will give that opinion.


. . .

(4) Consistency.  Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

(5) Specialization.  We generally give more
weight to the opinion of a specialist about medical
issues related to his or her area of specialty than
to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. §
404.1527(d).

If the ALJ rejects the opinion of a treating source, he

is required to articulate some basis for rejecting the opinion.

*Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of

Federal Regulations defines a treating source as:

[Y]our own physician, psychologist, or other
acceptable medical source who provides you or
has provided you, with medical treatment or
evaluation and who has, or has had, an ongoing
treatment relationship with you.

20 C.F.R. § 404.1502.

45

Dr. Jain treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. The ALJ noted, however, that Dr. Jain's opinion, which limited Plaintiff to less than sedentary work, was not supported by the objective medical evidence found in the records of Plaintiff's other treating physicians. TR 22. Specifically, the ALJ noted that Dr. Cushman limited Plaintiff to sedentary work in his April 2004 letter, and Dr. Johnson only limited Plaintiff to light work, as did the State Agency physicians (Drs. Burr and Patikas) in December 2003 and March 2004. TR 21. In addition, the ALJ highlighted that Dr. Jain's opinion was inconsistent with Plaintiff's own testimony, as she testified at her hearing that she was capable of lifting 10 pounds. TR 22.

As noted above, a treating source's opinion on the issues of the nature and severity of impairments is only entitled to controlling weight if such opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record. 20 C.F.R. § 416.927(d). Furthermore, the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. *Id*. In addition, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. *Id*.

46

Because of the inconsistencies between Dr. Jain's opinion and the opinions of Plaintiff's other treating sources as well as the lack of objective medical evidence to support this opinion, considered with inconsistencies in Plaintiff's own testimony and Dr. Jain's opinion, the ALJ's decision to reject Dr. Jain's opinion was proper. As a result, the ALJ's reliance instead on Dr. Cushman's opinion that Plaintiff was capable of performing sedentary work was also proper. Plaintiff's argument, therefore, fails.

## 2. The ALJ erred in failing to properly evaluate Plaintiff's mental impairments.

Plaintiff argues that the ALJ failed to properly evaluate the severity of Plaintiff's mental impairments. Docket Entry No. 15. Specifically, Plaintiff asserts that the ALJ failed to give adequate consideration to evidence from Plaintiff's treating psychiatrist, Dr. Dominguez, and instead relied on the opinion of consultative psychologist, Dr. Blazina. *Id.*

Dr. Dominguez treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to other opinions. However, as previously noted a treating source's opinion is only entitled to controlling weight if it is well-supported by medically acceptable clinical findings and not inconsistent with other substantial evidence in the case record. 20 C.F.R.

47

§ 416.927(d). The more consistent an opinion is with the record as a whole, the more weight the ALJ is obligated to give that opinion. *Id.*

The ALJ noted inconsistencies in the opinions of Dr. Blazina and Dr. Dominguez. While Dr. Blazina noted that Plaintiff's GAF was a 65 or 70, Dr. Dominguez determined Plaintiff to be functioning at a 55 or lower. TR 20. In addition, the ALJ noted that Plaintiff's statements regarding the severity of her mental limitations were inconsistent with her daily activities. TR 21. The ALJ stated that the Plaintiff's ability to perform such a variety of daily activities tends to negate the credibility of her subjective complaints, especially the degree of pain she maintained she experiences. *Id.* The ALJ further stated that one would not reasonably anticipate that a person who experiences substantial drowsiness and side effects from medications, the degree of pain alleged, or severe depression and anxiety, to be able to tolerate the physical demands, the level of concentration, or the amount of social interaction, necessary to perform such activities as caring for personal needs, preparing light meals, dusting, doing laundry, reading the Bible, talking to friends and relatives on the phone, watching television, and exercising. *Id.*

48

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

The ALJ observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and

49

the decision not to accord full credibility to Plaintiff's allegations was proper. Furthermore, because the ALJ is only obligated to give a treating source's opinion controlling weight if it is not inconsistent with other substantial evidence in the case record, the ALJ's decision to assign greater weight to Dr. Blazina's opinion and reject Dr. Dominguez's opinion was proper. *See* 20 C.F.R. § 416.927(d). As a result, Plaintiff's argument fails.

## IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.

50

*Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

/s/  Joe B. Brown
_____
Joe B. Brown
United States Magistrate Judge
